UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

In re:                                                    Chapter 11

MIRACLE HILL NURSING AND                    Case No. 23-40398-KKS
REHABILITATION CENTER, INC.

      Debtor.
_____/

**OBJECTION TO CLAIM NO. 7 OF**
**<u>1329 ABRAHAM STREET HOLDINGS, LLC</u>**

---

**IMPORTANT NOTICE TO CREDITOR:**
**THIS IS AN OBJECTION TO YOUR CLAIM**

**NOTICE OF OPPORTUNITY TO OBJECT AND FOR HEARING**

**This objection seeks to disallow, or reduce the amount, or change the priority status of the claim filed by you or on your behalf. Please read this objection carefully to identify which claim is objected to and the proposed treatment of the claim.**

**If you disagree with the objection or the proposed treatment of your claim, you MUST FILE AND SERVE A WRITTEN RESPONSE WITHIN 30 DAYS explaining why your claim should be allowed as presently filed. You must serve a copy of your response to the undersigned counsel for the Debtor, Scott A. Stichter of Stichter, Riedel, Blain & Postler, P.A., at 110 E. Madison Street, Suite 200, Tampa, FL 33602, and any other appropriate person within the time allowed OR YOUR CLAIM MAY BE DISPOSED OF IN ACCORDANCE WITH THE PROPOSED TREATMENT IN THIS OBJECTION. Your written response and certificate of service may be filed electronically or by mail at 110 E. Park Avenue, Suite 100, Tallahassee, FL 32301. ANY WRITTEN RESPONSE MUST CONTAIN THE CASE NAME AND CASE NUMBER.**

**If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested. If you file and serve a response within the time permitted, the Court will either schedule and notify you of a hearing or consider the response and grant or deny the relief requested without a hearing.**

**If this is a Chapter 11 case and your entire claim is objected to, you will not have the right to vote to accept or reject any proposed plan of reorganization until the objection is resolved unless you request an order temporarily allowing your claim for voting purposes. See Rule 3018(a), Fed.R.Bankr.P.**

MIRACLE HILL NURSING AND REHABILITATION CENTER, INC., (the "**Debtor**"), by and through its undersigned attorneys and pursuant to 11 USC §§ 502, 506, and 544 and Federal Rule of Bankruptcy Procedure 3007, hereby objects to the portion of Claim No. 7 filed by 1329 Abraham Street Holdings, LLC ("**1329 Abraham**"), which seeks to assert a secured claim in the bankruptcy case as well as seeking to recover post-petition interest, late charges, and attorney's fees and costs, and in support thereof, states:

<u>Material Facts</u>

1.      On October 12, 2023 (the "**Petition Date**"), the Debtor filed its Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") (Doc. No. 1). The Debtor continues to operate as a debtor-in-possession. For more information on the Debtor and the reasons for the

2

bankruptcy filing, please see the Case Management Summary (Doc. No. 21) and the Disclosure Statement for Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Doc. No. 170).

2.     On November 28, 2023, 1329 Abraham filed claim no. 7 (the "**Claim**") as a secured claim in the amount of $733,826.47. The Claim is based on a Promissory Note and Mortgage, both dated July 20, 2022,[1] and a UCC-1 Financing Statement dated July 26, 2022 (collectively, the "**Loan Documents**"). The purported security for the Claim is the real property located at 1329 Abraham Street in Tallahassee, Florida (the "**Real Property**"), together with personal property location therein and an assignment of rents (the "**Personal Property**"). The Claim includes amounts for interest at 12%, late charges at 5%, and attorneys' fees and costs.

3.     The Loan Documents underlying the Claim were executed by Willie T. Williams, purporting to act on behalf of the Debtor. The Debtor asserts that Dr. Williams did not have authority to bind the Debtor with respect to the Loan Documents. The current board of directors of the Debtor maintains that Williams acted without authority and that 1329 Abraham knew or should have known such authority was in question when it entered into the transaction giving rise to the Loan

---

[1] The Mortgage appears to have been recorded in the public records of Leon County, Florida, on July 29, 2022.

3

Documents.  Such objection was raised to the Documents in its response to litigation between the parties.

4.      Prior to execution of the Loan Documents, in or about November 2006, the Debtor entered into a financing transaction with Key Bank that included the granting of a mortgage against the Real Property under a program sponsored by the U.S. Department of Housing and Urban Development ("**HUD**").  Such transaction included the execution of a HUD Regulatory Agreement (the "**HUD Agreement**")[2] by the Debtor, wherein the Debtor and its owners[3] expressly agreed not to sell or encumber the Real Property or any personal property of the facility (including rents) without the prior written approval of the Secretary of Housing and Urban Development (the "**Secretary**").  A copy of the HUD Agreement, together with subsequent modification agreements concerning the underlying debt which reaffirm the Debtor's and its owners' obligations under the HUD Agreement,[4] are attached hereto as Composite **Exhibit A** and incorporated herein by reference.

5.      The Secretary did not give prior written approval of the Loan Documents or the encumbrances allegedly resulting therefrom before such

---

[2] The HUD Agreement was executed and recorded in the public records of Leon County, Florida, on November 28, 2006.

[3] "Owners" is defined in the HUD Agreement as "Miracle Hill Nursing and Convalescent Center, Inc., a Florida nonprofit corporation, and all present and future officers and directors thereof."

[4] The 2015 and 2020 Modification Agreements expressly reaffirm the obligations in the HUD Agreement, were also recorded in the public records of Leon County contemporaneous with their execution, and memorialize the Debtor's transition from Miracle Hill Nursing and Convalescent Center, Inc. to Miracle Hill Nursing and Rehabilitation Center, Inc.

4

Documents were executed.

Legal Authority

6.      11 U.S.C. § 502(a) provides that a claim is allowed unless a party in interest objects.  Thus, any party in interest has standing to object to a creditor's claim.  *Caserta v. Tobin*, 175 B.R. 773, 774 (S.D. Fla. 1994) (while Congress did not define the term "party in interest," a debtor is deemed to be a party in interest where no trustee has been appointed or where the debtor has a pecuniary interest in the estate.)

7.      A debtor in possession holds the rights and powers of a chapter 11 trustee and, as such, is a party in interest who may make such an objection. *See* 11 U.S.C. 1107(a); *In re Charles K. Breland, Jr.*, No. 16-2272-JCO, WL 3323881, at 4 (S.D. Ala. Bankr. July 5, 2018); *In re Towery*, 53 B.R. 76, 77 (W.D. Ky. Bankr. 1985).

8.      If such an objection is made, the Court, after notice and a hearing, shall determine the extent of the claim's validity.  *In re Argiannis*, 156 B.R. 683, 687 (M.D. Fla. Bankr. 1993) (where a chapter 11 debtor properly objected to the amount and extent of a creditor's claim).

9.      The Court must disallow a claim which is unenforceable against a debtor under applicable law. *See In re Maxcy*, 45 B.R. 268, 270 (D. Mass. Bankr. 1985); *Brosco Inc. v. Toledo*, 17 B.R. 914, 917 (D. Puerto Rico 1982). Section

502(b)(1) specifically disallows any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." *See* 11 U.S.C. § 502(b)(1); *In re B-Bar Tavern, Inc.*, 506 B.R. 879, 910 (D. Mont. 2013) (citing *Raleigh v. Illinois Dept, of Revenue*, 530 U.S. 15 (2000)). This provision is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy. *Id*.

10.    The validity of claims and defenses thereto are therefore often determined under applicable state or federal law. *B-Bar Tavern*, at 911; *Maxcy*, 45 B.R. at 270. In the instant case, that applicable law comes from both sources – state law on the enforceability of agreements executed without authority and in violation of other corporate obligations, and federal law on the enforceability of lending agreements with federal administrative agencies.

11.    Chapter 617 of the Florida Statutes contains the Florida Not For Profit Corporation Act (the "**Act**"), which governs Florida non-profit corporations like the Debtor. The Act requires directors of a non-profit corporation to act in good faith and to exercise the care an ordinarily prudent person would exercise. *See* § 617.0830(1), Fla. Stat. *See also Flight Equip. & Eng'g Corp. v. Shelton,* 103 So.2d 615, 626 (Fla.1958) (An officer or director occupies a quasi-fiduciary relation to the corporation and the existing stockholders. He is bound to act with fidelity and the

utmost good faith. He is bound to be loyal to his trust.); *Tampa Water-works v. Wood*, 121 So. 789 (1929).

12.     The Act also requires a majority vote of the Board of Directors where a quorum is present to take corporate action to encumber corporate assets. *See* §§ 617.0824 & 617.1201, Fla. Stat.; *Heron at Destin West Beach & Bay Resort Condo. Ass'n, Inc. v. Osprey at Destin West Beach & Bay Resort Condo. Ass'n, Inc.*, 94 So.3d 623, 630 (Fla. 1st DCA 2012). Acts taken by a non-profit board of directors without the required vote of a majority of the board of directors are ultra vires and without legal effect. *Word of Life Ministry, Inc. v. Miller*, 778 So.2d 360, 364 (where the Court invalidated action purportedly taken by the Board of Directors of a church without the required vote of a majority of the Board.)

13.     Finally, federal law concerning the effect of a HUD regulatory agreement is relevant to enforceability of the 1329 Claim. "Regulatory Agreements are a fundamental and essential component of the Federal financing scheme for multifamily housing projects under the National Housing Act. . . . Accordingly, the importance HUD attaches to the project's ironclad observance of the terms of the Regulatory Agreement cannot be contested." *U.S. v. Harvey*, 68 F.Supp.2d 1010, 1017 (S.D. Ind. 1998).

14.     A creditor is not entitled to post-petition interest, penalties or attorney's fees and costs on its claim unless it is oversecured and such entitlement is set forth

7

in writing in enforceable agreements or provided for by the statute.  *See* 11 U.S.C. 506(b); *Argiannis*, 156 B.R. at 687.

Objections to the Claim

15.    The Loan Documents are invalid.  There was no authority to enter into the underlying transaction or to grant security for such debt on behalf of the Debtor, such that the transaction was without legal effect.

16.    1329 Abraham knew or should have known that such authority was in question when it entered into the transaction giving rise to the Loan Documents.

17.    The Loan Documents are voidable because they were executed in violation of the HUD Agreement, which expressly prohibited the exact type of sale transaction and encumbrance contemplated and/or granted in connection with the Loan Documents.

18.    1329 Abraham had actual and/or constructive notice that the Loan Documents were executed in violation of the HUD Agreement prior to executing such Documents.

19.    1329 Abraham is not entitled to interest, penalties or attorneys' fees and costs because such entitlement is not set forth in writing in an enforceable agreement.

20.    1329 Abraham is not entitled to post-petition interest, penalties or attorneys' fees and costs because its claim is not oversecured.

4894-3431-8247, v. 2

WHEREFORE, the Debtor respectfully requests that the Court enter an order (i) sustaining the Objection, (ii) holding that the purported security for the Claim is void and therefore the Claim, to the extent allowed, is wholly unsecured; (iii) holding that the holder of the Claim, to the extent such claim is allowed, is not entitled to interest, late fees, or attorneys' fees and costs, and (iv) granting such other and further relief as may be just.

/s/ Scott A. Stichter
Scott A. Stichter (Florida Bar No. 0710679)
Stichter, Riedel, Blain & Postler, P.A.
110 E. Madison Street, Ste. 200
Tampa, Florida 33602-4718
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Email: sstichter@srbp.com
       sstichter.ecf@srbp.com
Counsel for Debtor

4894-3431-8247, v. 2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the *Objection to Claim No. 7 of 1329 Abraham Street Holdings, LLC* has been furnished on March 25, 2024, by the Court's CM/ECF electronic mail system to all parties receiving CM/ECF electronic noticing:

Paul Burke on behalf of Creditor Synovus Bank c/o Burke Moore Law Group, LLP
pleadings@burkemoore.com

Blake J. Delaney on behalf of Creditor Caterpillar Financial Services Corporation
blake.delaney@bipc.com, kara.bernstein@bipc.com; eservice@bipc.com;
donna.curcio@bipc.com;joseph.roadarmel@bipc.com

Jodi Daniel Dubose on behalf of Debtor/Defendant Miracle Hill Nursing and
Rehabilitation Center, Inc.  jdubose@srbp.com, jdubose.ecf@srbp.com

Katherine C Kerwin on behalf of Creditor United States Department of Housing
and Urban Development and Creditor United States Small Business Administration
katherine.kerwin@usdoj.gov, Marsha.s.francis@usdoj.gov;
caseview.ecf@usdoj.gov; Kristina.Bennett@usdoj.gov

Conor McLaughlin on behalf of U.S. Trustee United States Trustee
conor.mclaughlin@usdoj.gov

Eric Scott Pendergraft on behalf of Creditor KeyBank, National Association
ependergraft@slp.law, dwoodall@slp.law;dlocascio@slp.law;pmouton@slp.law

Adina L. Pollan on behalf of Defendant/Interested Party Florida State Primitive
Baptist Convention, Inc. and Interested Party Willie J. Williams
apollan@mcglinchey.com, nreid@mcglinchey.com

Alexis Sophia Read on behalf of Creditor/Plaintiff 1329 Abraham Street Holdings
LLC asr@alexisreadlaw.com

4894-3431-8247, v. 2

Heather L. Ries on behalf of Premier Healthcare Staffing Solutions, LLC
hries@foxrothschild.com

Scott A. Stichter on behalf of Debtor/Defendant Miracle Hill Nursing and
Rehabilitation Center, Inc.  sstichter.ecf@srbp.com

United States Trustee USTPRegion21.TL.ECF@usdoj.gov

Chantel Wonder on behalf of Florida Date Primitive Baptist Convention, Inc.
cwonder@mcglinchey.com rwalters@mcglinchey.com

Byron Wright III on behalf of Shaun E. Laurie, M.D. twright@brunerwright.com

Chantel Christine Wonder on behalf of Interested Party Florida State Primitive
Baptist Convention, Inc. and Willie J. Williams cwonder@mcglinchey.com,
rwalters@mcglinchey.com


                           */s/ Scott A. Stichter*
                          Scott Stichter

11

# DOCUMENT CERTIFICATION

Certified to be a true and correct copy of the original
of the following document:

## Regulatory Agreement

Recorded on November __28__ , 2006

With the Register's Office of Leon County, Florida

As Document No. _20060111310_

Date: November _28_ , 2006

**ATTORNEY'S TITLE INSURANCE
FUND, INC.**

By: _____
Name: _Andrea Valencia Nelson_
Title: _Title Agent_

Exhibit A

# Regulatory Agreement for Multifamily Housing Projects

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

Upon recording return to:
U.S. Department of Housing and Urban Development
400 West Bay Street, Suite 1015
Jacksonville, Florida 32202-4410

## Under Sections 207, 220, 221(d)(4), 231 and 232, Except Nonprofits

| Project Number | | Mortgagee |
|---|---|---|
| 2023 | | KEYCORP REAL ESTATE CAPITAL MARKETS, INC. |

| Amount of Mortgage Note | | Date |
|---|---|---|
| $5,807,700.00 | | as of even date herewith |

| Mortgage Recorded | State Florida | County Leon | Date | Originally endorsed for insurance under Section |
|---|---|---|---|---|
| Book | | Page | contemporaneously herewith | 232 pursuant to Section 223 (f) |

This Agreement entered into this **28th** _____ as of _____ day of **November** , 20 **06** between **MIRACLE HILL NURSING AND CONVALESCENT CENTER, INC., a Florida nonprofit corporation** whose address is **1329 Abraham Street Tallahassee, Florida 32304**

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgage property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to **$ 5,600.00\*** per month unless a different date or amount is approved in writing by the Secretary.

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

3. Real property covered by the mortgage and this agreement is described in Schedule A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232.)

4. (a) Owners shall make dwelling accommodation and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

(b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owners or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule. Approval of charges for facilities and services is not required for any project not subject to regulation of rent by the Secretary.

(c) For any project subject to regulation of rent by the Secretary, the Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

---

Replaces FHA-2466 which may be used until supply exhausted          Page 1 of 6

form HUD-92466 (11/2002)
ref Handbook 4571 1

*In addition, the Mortgagor shall make an initial deposit to the Reserve for Replacement Fund in the amount of $  56,600.00 56,303.00

(i)  Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control or;

(ii)  Deny the increase stating the reasons therefor.

5.  (a)  If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Sections 231 or 232 and is not designed primarily for occupancy by elderly persons, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(b)  If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1)  For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants;

(2)  Thereafter, and on a continuing basis, such preferred applicants shall be given preference over nonpreferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3)  Through such further provisions agreed to in writing by the parties.

(c)  Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d)  All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

6.  Owners shall not without the prior written approval of the Secretary:

(a)  Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.

(b)  Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c)  Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d)  Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e)  Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1)  All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2)  No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3)  Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4)  There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f)  Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g)  Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h)  Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

7.  Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8.  Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

9.  (a)  Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b)  Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c)  The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property ad the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) If the mortgage is insured under Section 232:

    (1) The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.

    (2) The Owners shall suitably equip the project for nursing home operations.

    (3) The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.

        (i) If the mortgage is insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts

100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

    (ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to, declare a default under the not and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but, upon default this permission is terminated as to all rents due or collected thereafter.

Exhibit A

13.  As used in this Agreement the term:

(a)  "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b)  "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c)  "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d)  "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e)  "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f)  "Surplus Cash" means any cash remaining after:

(1)  the payment of:

(i)  All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii)  All amounts required to be deposited in the reserve fund for replacements;

(iii)  All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2)  the segregation of:

(i)  An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii)  All tenant security deposits held.

(g)  "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h)  "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by this Agreement after written notice;

(i)  "Section" refers to a Section of the National Housing Act, as amended.

(j)  "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k)  "Elderly person" means any person, married or single, who is sixty-two years of age or over.

14.  This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15.  Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16.  The invalidity of any clause, part or provisions of this Agreement shall not affect the validity or the remaining portions thereof.

17.  The following Owners:  See below.*

Do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a)  for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b)  for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

(To be executed with formalities for recording a deed to real estate.)

*Miracle Hill Nursing and Convalescent Center, Inc., a Florida nonprofit corporation, and all present and future officers or directors thereof.

18.  Annually, at the same time as the submission of the Annual Audited Financial Statements, the Owner will ensure that the operator or manager of the facility provides to the Office of Multifamily Housing Programs in Headquarters evidence of compliance with Professional Liability Insurance requirements.

**IN WITNESS WHEREOF**, the parties have executed this Regulatory Agreement as of the date first above written.

> **MIRACLE HILL NURSING AND CONVALESCENT CENTER, INC.**
> a Florida nonprofit corporation
>
> By: _____
> Edward Buckner
> President

STATE OF FLORIDA       ]

COUNTY OF _Duval_      ] ss:
                               ]

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgments, personally appeared Edward Buckner, to me known to be the person described in and who executed the foregoing instrument as President of MIRACLE HILL NURSING AND CONVALESCENT CENTER, INC., a Florida nonprofit corporation named therein, and acknowledged before me that he/she executed the same as such officer in the name and on behalf of said corporation.

Witness my hand and official seal in the county and state last aforesaid, this 21st day of November, 2006.

[SEAL]
                                       Notary Public

My Commission Expires: _April 13, 2010_

> MARLA RANDALL
> MY COMMISSION # DD 540159
> EXPIRES: April 13, 2010
> Bonded Thru Notary Public Underwriters

Page 5 of 6

**SECRETARY OF HOUSING AND URBAN DEVELOPMENT ACTING BY AND THROUGH THE FEDERAL HOUSING COMMISSIONER**

By: _____
Authorized Agent

STATE OF FLORIDA                    ]
COUNTY OF Duval                     ]:ss
                                    ]

I, Marla Randall, a Notary Public in and for the jurisdiction aforesaid, do hereby certify that on the 21st day of November, 2006, personally appeared before me Adam P. Schultz, who, being duly sworn, did say that he/she is the duly appointed Authorized Agent and the person who executed the foregoing instrument by virtue of the authority vested in him/her by 24 C.F.R. 200.118/119 and acknowledged the same to be his/her free and voluntary act and deed as Authorized Agent for and on behalf of the **SECRETARY OF HOUSING AND URBAN DEVELOPMENT.**

Witness my hand and official seal.

_____
Notary Public

[SEAL]

My Commission Expires: April 13, 2010

Prepared by:

Harrison C. Smith, Esq.
Krooth & Altman LLP
1850 M Street, NW, Suite 400
Washington, DC  20036

Page 6 of 6

Exhibit A

# RIDER I TO REGULATORY AGREEMENT

Miracle Hill Nursing and Convalescent Center
Tallahassee, Leon County, Florida
FHA Project No.        2023

In accordance with the terms of this loan, HUD shall reevaluate the Project's Replacement Reserve needs every ten years following initial/final endorsement. In order to assist HUD in its review, Mortgagee has agreed to obtain a new Project Capital Needs Assessment ("PCNA") within six months following each 10-year anniversary of initial/final endorsement, i.e., 10, 20, 30, for so long as the mortgage loan is insured by HUD; provided that, should a new PCNA be required when the remaining term of the loan is less than 10 years, then, the PCNA shall cover the remaining term.

Funds to pay for each required PCNA may be paid from the Project's Replacement Reserve Account, to the extent available, with prior written approval of HUD.

The terms and agreements contained herein shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Exhibit A

Case 23-40398-KKS Doc 96 Filed 11/22/23 Page 57 of 84
Case 23-40398-KKS Doc 203 Filed 03/26/24 Page 20 of 39

## EXHIBIT "A"

**Parcel 1:**

Commence at the Southwest corner of Mickler's Subdivision, a subdivision as per map or plat thereof recorded in Deed Book "HH" Page 590 of the Public Records of Leon County, Florida, said point also marking the intersection of the Northerly right-of-way boundary of Alabama Street and the Easterly right-of-way boundary of Abraham Street, thence run, along said Eastern right-of-way boundary of Abraham Street, North 00° 00' 00" West for a distance of 113.54 feet to an iron pin and the POINT OF BEGINNING, thence continue along said Eastern right-of-way boundary of Abraham Street, North 00° 00' 00" West for a distance of 409.90 feet to an iron pin; thence run North 89° 52' 04" East for a distance of 339.94 feet to an iron pin; thence run South 00° 00' 00" West for a distance of 409.89 feet to an iron pin; thence run South 89° 51' 59" West for a distance of 339.94 feet to an iron pin and the POINT OF BEGINNING, containing 139339.03 square feet or 3.20 acres, more or less.

**Parcel 2:**

Commence at the Southwest corner of Mickler's Subdivision, a subdivision as per map or plat thereof recorded in Deed Book "HH" Page 590 of the Public Records of Leon County, Florida, said point also marking the intersection of the Northerly right-of-way boundary of Alabama Street and the Easterly right-of-way boundary of Abraham Street, run thence, along said Northern right-of-way boundary of Alabama Street, North 89° 51' 59" East for a distance of 339.94 feet to an iron pin, and the POINT OF BEGINNING; thence run North 00° 00' 00" East for a distance of 210.00 feet to an iron pin; thence run North 90° 00' 00" East for a distance of 202.00 feet to an iron pin; thence run South 00° 00' 00" West for a distance of 208.53 feet to an iron pin on the said Northern right-of-way boundary of Alabama Street; thence, along the said Northern right-of-way boundary of Alabama Street, run South 89° 52' 00" West for a distance of 202.00 feet to an iron pin, and the POINT OF BEGINNING, containing 42372.53 square feet or 0.97 acres, more or less.

**Parcel 3:**

Commence at the Southwest corner of Mickler's Subdivision, a subdivision as per map or plat thereof recorded in Deed Book "HH" Page 590 of the Public Records of Leon County, Florida, said point also marking the intersection of the Northerly right-of-way boundary of Alabama Street and the Easterly right-of-way boundary of Abraham Street, thence, along said Northern right-of-way boundary of Alabama Street, run North 89° 51' 59" East for a distance of 339.94 feet to an iron pin; thence run North 00° 00' 00" East for a distance of 210.00 feet to an iron pin and the POINT OF BEGINNING; thence run North 00° 00' 00" East for a distance of 313.43 feet to an iron pin; thence run South 89° 40' 26" East for a distance of 291.38 feet to an iron pin; thence run South 00° 00' 00" West for a distance of 621.09 feet to an iron pin on the said Northern right-of-way boundary of Alabama Street; thence, along said Northern right-of-way boundary of Alabama Street, run South 89° 51' 59" West for a distance of 89.37 feet to an iron pin on the said Northern right-of-way boundary of Alabama Street; thence run North 00° 00' 00" for a distance of 208.53 feet to an iron pin; thence run South 90° 00' 00" West for a distance of 202.00 feet to an iron pin and the POINT OF BEGINNING, containing 109799.76 square feet or 2.52 square feet, moe or less.

**Parcel 4:**

BEGINNING at the Southwest corner of Mickler's Subdivision, a subdivision as per map or plat thereof recorded in Deed Book "HH" Page 590 of the Public Records of Leon County, Florida, said point also marking the intersection of the Northerly right-of-way boundary of Alabama Street and the Easterly right-of-way boundary of Abraham Street, thence, along said Eastern right-of-way boundary of Abraham Street, North 00° 00' 00" East for a distance of 113.54 feet to an iron pin; thence run North 89° 51' 59" East for a distance of 339.94 feet to an iron pin; thence run South 00° 00' 00" West for a distance of 113.54 feet to an iron pin on the said Northern right-of-way boundary of Alabama Street; thence, along said Northern right-of-way boundary of Alabama Street, run South 89° 51' 59" West for a distance of 339.94 feet to an iron pin and the POINT OF BEGINNING, containing 38596.68 square feet or 0.89 acres, more or less.

Exhibit A

Containing in aggregate: 330108 square feet, or 7.58 acres, more or less.

Being further described as follows:

BEGINNING at the Southwest corner of Mickler's Subdivision, a subdivision as per map or plat thereof recorded in Deed Book "HH" Page 580 of the Public Records of Leon County, Florida, said point also marking the intersection of the Northerly right-of-way boundary of Alabama Street and the Easterly right-of-way boundary of Abraham Street, thence, along said Eastern right-of-way boundary of Abraham Street, run North 00° 00' 00" East for a distance of 113.54 feet to an iron pin, thence, continuing along said Eastern right-of-way boundary of Abraham Street, run North 00° 00' 00" West for a distance of 409.90 feet to an iron pin; thence run North 89° 52' 04" East for a distance of 339.94 feet to an iron pin; thence run South 89° 40' 26" East for a distance of 291.38 feet to an iron pin; thence run South 00° 00' 00" West for a distance of 521.09 feet to an iron pin on the said Northern right-of-way boundary of Alabama Street; thence, along said Northern right-of-way boundary of Alabama Street, run South 89° 51' 59" West for a distance of 89.37 feet to an iron pin; thence, continuing along said Northern right-of-way boundary of Alabama Street, run South 89° 52' 00" West for a distance of 202.00 feet to an iron pin; thence, continuing along said Northern right-of-way boundary of Alabama Street, run South 89° 51' 59" West for a distance of 339.94 feet to an iron pin and the POINT OF BEGINNING, containing 330108 square feet, or 7.58 acres, more or less.

Exhibit A

MIRACLE HILL NURSING AND CONVALESCENT CENTER
FHA Project No.        :2023

## MODIFICATION OF MORTGAGE NOTE

Attached to and Incorporated into the
Mortgage Note Executed and Delivered by
**Miracle Hill Nursing and Convalescent Center, Inc., a Florida nonprofit corporation
to KeyCorp Real Estate Capital Markets, Inc., an Ohio corporation
dated as of November 28, 2006**

      **THIS MODIFICATION OF MORTGAGE NOTE** (this "Modification of Note") is made as of August 1, 2015, by and between **MIRACLE HILL NURSING AND REHABILITATION CENTER, INC.**, a Florida nonprofit corporation formerly known as Miracle Hill Nursing and Convalescent Center, Inc., a Florida nonprofit corporation (hereinafter called "Maker") and **KEYBANK NATIONAL ASSOCIATION**, a national banking association, successor by merger of KeyCorp Real Estate Capital Markets, Inc., an Ohio corporation (hereinafter called "Holder") and approved by the **SECRETARY OF HOUSING AND URBAN DEVELOPMENT** ("HUD"). This Modification of Note is attached to and incorporated in that certain mortgage note dated as of November 28, 2006, executed and delivered by Maker to Holder in connection with the project known as Miracle Hill Nursing and Convalescent Center, FHA Project No.        2023 (the "Note"), in the original principal sum of Five Million Eight Hundred Seven Thousand Seven Hundred and No/100 Dollars ($5,807,700.00), and, following the September 1, 2015 payment, an unpaid principal balance of Five Million Two Hundred Seventy-One Thousand Eight Hundred Seventy-Seven and 90/100 Dollars ($5,271,877.90).

      FOR AND IN CONSIDERATION OF the sum of Ten Dollars ($10.00) in hand paid and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, the parties, for themselves and for their respective successors and assigns, do hereby agree that, effective on the "Effective Date" (as hereinafter defined), the terms of the Note to which this Modification of Note is appended are hereby amended as follows:

      1.  The obligation of Maker under the Note to make monthly payments of principal and/or interest is hereby amended (a) by replacing the phrase "with interest thereon from the date hereof at the rate of Six and one quarter per centum (6.25%) per annum on the unpaid balance until paid" located in the first sentence of the first paragraph of the Note with the phrase "with interest thereon from the date hereof at the rate specified herein on the unpaid balance until paid"; and (b) by inserting in lieu of the text immediately following such first sentence (which begins "The principal and interest . . ." and concludes ". . . shall be applied on account of principal") the following:

      "The principal and interest shall be payable in monthly installments as follows:

      Interest alone at the rate aforesaid shall be due and payable on December 1, 2006. Commencing on January 1, 2007, monthly installments of principal and interest shall be

due and payable in the sum of Thirty-Four Thousand Ninety-Five and 64/100 Dollars ($34,095.64) each, such payments to continue monthly thereafter on the first day of each succeeding month up to and including September 1, 2015. Commencing on October 1, 2015, monthly installments of principal and interest shall be due and payable in the sum of Twenty-Six Thousand Six Hundred Thirteen and 00/100 Dollars ($26,613.00) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest, shall be due and payable on December 1, 2041. The installments of principal and interest shall be applied first to interest at the rate of six and one quarter per centum (6.25%) per annum up to and including August 31, 2015, and thereafter at the rate of three and eighty-seven one-hundredths per centum (3.87%) per annum, upon the principal sum or so much thereof as shall from time to time remain unpaid, and the balance thereof shall be applied on account of principal."

2.    The Allonge to Mortgage Note, attached to and made a part of the Note, is hereby deleted, and the Rider to Mortgage Note attached hereto, and dated as of even date herewith, is substituted therefor.

3.    The Note is hereby amended so that all references to the "Mortgage" or "mortgage" contained in the Note shall be deemed to be references to the Mortgage securing the Note, as modified to date (if applicable) and as modified by that certain Modification Agreement of even date herewith by and among the Maker, the Holder, and HUD (the "Modification Agreement").

4.    Maker hereby acknowledges and affirms to the Holder that, as of the Effective Date, there are no counter-claims, defenses, or set-offs, whether legal or equitable, to Maker's obligations under the Note, as amended, and Maker hereby waives the right to raise or assert any such defenses, set-offs, or counter-claims, as well as any and all other claims, which Maker has, had, or may have had against Holder with respect to any matter or claim based upon any act, event, occurrence or omission occurring or arising prior to the Effective Date.

5.    Maker hereby acknowledges and affirms to the Holder that, as of the Effective Date, Maker is in compliance with all of Maker's obligations under the Note.

6.    From and after the Effective Date, the Note, all amendments to date, and this Modification of Note shall be taken and read together as one, single and continuing instrument evidencing a single debt owed by the Maker to the Holder in the amount set forth in the Note, as may be unpaid from time to time. Nothing contained herein shall be taken or construed to create a novation or new agreement by and between the Maker and the Holder, it being the intention of the parties solely (a) to reduce the per annum rate of interest applicable under the Note, (b) to revise the amount of monthly installments of principal and interest payable thereunder as a result of such reduction in interest rate so as to reamortize in full the outstanding principal balance of the loan evidenced by the Note over the remaining term thereof, and (c) to revise certain other provisions of the Note, as reflected by this Modification of Note, and for no other purpose. Furthermore, nothing herein contained shall in any way impair the Note or the security now held for such indebtedness, or

alter, waive, annul, vary, or affect any provision, condition, or covenant therein except as herein provided, nor affect or impair any rights, powers, or remedies of the Holder under the Note, it being the intent of the parties that the terms and provisions of the Note shall continue in full force and effect except as modified hereby.

7.  Notwithstanding anything herein contained, if any one or more of the provisions of this Modification of Note shall for any reason whatsoever be held to be illegal, invalid, or unenforceable in any respect, such illegality, invalidity, or unenforceability shall not affect any other provision of this Modification of Note, but this Modification of Note shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

8.  Maker and Holder agree to execute such other documents as may be necessary to implement the terms and provisions of this Modification of Note, and the transaction evidenced hereby, including but not limited to the Modification Agreement.

9.  The Note, as amended by this Modification of Note, may not be further amended except by an instrument in writing executed by each of the parties hereto.

10.  This Modification of Note shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

11.  Maker and Holder acknowledge and agree that the terms of this Modification of Note and the Modification Agreement are subject to and contingent upon the approval thereof by HUD, which approval shall be evidenced by the written consent on behalf of HUD affixed to this Modification of Note and to the Modification Agreement, and further acknowledge and agree that the terms of this Modification of Note and the Modification Agreement shall not be deemed effective unless and until (i) HUD executes the consents as aforesaid and (ii) the Modification Agreement is recorded in accordance with the terms thereof (the date on which the Modification Agreement is so recorded is sometimes referred to herein as the "Effective Date").

12.  This Modification of Note may be executed in any number of counterparts and all counterparts shall be construed together and shall constitute but one agreement.

**IN WITNESS WHEREOF,** Maker, Holder, and HUD have executed this Modification of Note as of the date first set forth above.

*[Remainder of page intentionally left blank.  Counterpart signature pages follow.]*

3

Exhibit A

## COUNTERPART SIGNATURE PAGE TO MODIFICATION OF MORTGAGE NOTE

**MAKER:**

**MIRACLE HILL NURSING AND REHABILITATION CENTER, INC.,** a Florida nonprofit corporation, formerly known as Miracle Hill Nursing and Convalescent Center, Inc., a Florida nonprofit corporation

By: _____

Name: Roland H. Gaines

Title: Chairman, Board of Directors

## <u>COUNTERPART SIGNATURE PAGE TO MODIFICATION OF MORTGAGE NOTE</u>

**HOLDER:**

**KEYBANK NATIONAL ASSOCIATION,**
a national banking association, successor by merger of
KeyCorp Real Estate Capital Markets, Inc., an Ohio
corporation

By: _____
Name: Annetta Berry
Title: Vice President

5

Exhibit A

## <u>COUNTERPART SIGNATURE PAGE TO MODIFICATION OF MORTGAGE NOTE</u>

MIRACLE HILL NURSING AND CONVALESCENT CENTER
FHA Project No.        2023

**CONSENT TO MODIFICATION OF MORTGAGE NOTE:**

The undersigned hereby consents to and approves
the foregoing Modification of Mortgage Note as of the date first set forth above.

**SECRETARY OF HOUSING AND URBAN
DEVELOPMENT,** acting by and through the Federal
Housing Commissioner

By: _Jennifer S. Buhlman_
Name: _Jennifer S. Buhlman_
Title:   Authorized Agent

6
Exhibit A

## RIDER TO MORTGAGE NOTE

This Rider to Mortgage Note (this "Rider"), made as of August 1, 2015, is attached to and made a part of the Mortgage Note dated as of November 28, 2006 (the "Note"), from Miracle Hill Nursing and Rehabilitation Center, Inc., a Florida nonprofit corporation now known as **MIRACLE HILL NURSING AND REHABILITATION CENTER, INC.,** a Florida nonprofit corporation (hereinafter called "Maker"), to **KEYBANK NATIONAL ASSOCIATION,** a national banking association, successor by merger to KeyCorp Real Estate Capital Markets, Inc., an Ohio corporation.

     1.    <u>Prepayment.</u> (a)  Except as hereinafter set forth, Maker shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time.  Maker shall have the right, on or after September 30, 2015 (the "Lockout Termination Date") to prepay the indebtedness evidenced hereby in whole or in part on the last business day of any calendar month on or after such date during the term hereof upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid.  Such total amount shall include interest accrued through and including the last day of the month in which the prepayment is made.  In the event of any prepayment of principal at any time on or after the Lockout Termination Date, the Maker shall concurrently pay to the holder of this Note (i) interest on the amount prepaid through and including the last day of the month in which the prepayment is made and (ii) a prepayment premium equal to the following designated percentages of the amount of the principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from September 30, 2015 through September 29, 2016 | 10.0% |
| from September 30, 2016 through September 29, 2017 | 9.0% |
| from September 30, 2017 through September 29, 2018 | 8.0% |
| from September 30, 2018 through September 29, 20`9 | 7.0% |
| from September 30, 2019 through September 29, 2010 | 6.0% |
| from September 30, 2020 through September 29, 2021 | 5.0% |
| from September 30, 2021 through September 29, 2022 | 4.0% |
| from September 30, 2022 through September 29, 2023 | 3.0% |
| from September 30, 2023 through September 29, 2024 | 2.0% |
| from September 30, 2024 through September 29, 2025 | 1.0% |
| from September 30, 2025 and thereafter | 0.0% |

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, without the prior written consent of the holder of this Note (which consent such holder shall have no obligation to give), the Maker shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

     (b)    Notwithstanding any prepayment prohibition imposed and/or premium required by this Note with respect to prepayments made prior to September 30, 2024, the indebtedness evidenced by this Note may be prepaid in whole or in part on the last business day of any calendar month without the consent of the holder of this Note and without prepayment premium if the Federal Housing Commissioner (the "Commissioner") determines that prepayment will avoid a mortgage insurance claim and is therefore in the best interests of the Federal Government.  The holder of this Note understands that the Commissioner

R-1

would consider exercising its right to override the prepayment prohibition and/or prepayment premium contained herein only upon satisfaction of all of the following terms and conditions:

       (i)     Maker has defaulted under this Note and the Commissioner has received notice of such default, as required by 24 C.F.R. §207.256;

       (ii)     The Commissioner determines that the project financed with the proceeds of this Note has been experiencing a net income deficiency, which has not been caused solely by management inadequacy or lack of interest by Maker, and which is of such magnitude that Maker is currently unable to make required debt service payments, pay all project operating expenses and fund all required HUD reserves;

       (iii)     The Commissioner finds there is reasonable likelihood that Maker can arrange to refinance the loan evidenced by this Note at a lower interest rate or otherwise reduce the debt service payments through partial prepayment; and

       (iv)     The Commissioner determines that refinancing the loan evidenced by this Note at a lower rate or partial prepayment is necessary to restore the said project to a financially viable condition and to avoid an insurance claim.

       (c)     Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to any prepayment which is made by or on behalf of the Maker from insurance proceeds as a result of damage to the mortgaged premises or condemnation awards which, at the option of the holder of this Note, may be applied to reduce the indebtedness of Maker evidenced hereby pursuant to the terms and provisions of the security instrument securing this Note (the "Mortgage") of even date with the Note, given by Maker to the original holder of this Note to secure said indebtedness. Any prepayment made pursuant to this Paragraph 1(c) shall be deemed to have been made on the last day of the month in which such payment is received by holder and shall include interest on the amount prepaid through and including the last day of the month in which the prepayment is made.

       (d)     Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, in the event that the maximum principal amount of this Note is reduced (or a partial prepayment is made) solely as the result of a mortgage reduction (or a partial prepayment) required by the Commissioner based upon any cost certification or other report required to be provided by the Maker to the Commissioner subsequent to the date hereof. Any prepayment made pursuant to this Paragraph 1(d) shall be deemed to have been made on the last day of the month in which such payment is received by holder and shall include interest on the amount prepaid through and including the last day of the month in which the prepayment is made.

       2.     <u>Late Charges</u>. In the event any installment or part of any installment due under this Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of this Note, in addition to other sums due hereunder, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent. Whenever, under the law of the jurisdiction where the property is located, the amount of any such late charge is considered to be additional interest, this provision shall not be effective if the rate of interest specified in this Note, together with the amount of the late charge, would aggregate an amount in excess of the maximum rate of interest permitted and would constitute usury.

3.    <u>Method of Payment</u>.  All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, and all late charges and other amounts required to be paid hereunder, other than regularly scheduled installments of interest, shall be made to the holder of this Note in immediately available Federal Funds.  Payments received after 12:00 noon Eastern time will be deemed to have been received on the next following business day.

4.    <u>Non-Recourse</u>.  Notwithstanding any other provision contained in this Note, it is agreed that the execution of this Note shall impose no personal liability on the Maker hereof for payment of the indebtedness evidenced hereby, and, in the event of a default, the holder hereof shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced hereby and will not seek or obtain any deficiency or personal judgment against the Maker hereof except such judgment or decree as may be necessary to foreclose or bar its interest in the Collateral, except as set out in the Mortgage.  As used herein, "Collateral" shall mean and include (i) the property subject to the Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto, and the rents, issues, and profits thereof, as set forth in said Mortgage and (ii) the collateral described in the Security Agreement of even date with the Note given to further secure the Note.

IN WITNESS WHEREOF, the undersigned Maker has executed this Rider as of the date first above written.

MIRACLE HILL NURSING AND
REHABILITATION CENTER, INC., a Florida nonprofit
corporation, formerly known as Miracle Hill Nursing and
Convalescent Center, Inc., a Florida nonprofit corporation

By: _____
Name: Roland H. Gaines
Title:  Chairman, Board of Directors

MIRACLE HILL NURSING AND CONVALESCENT CENTER
FHA Project No.        2023

## SECOND MODIFICATION OF MORTGAGE NOTE

**Attached to and Incorporated into the
Mortgage Note Executed and Delivered by
Miracle Hill Nursing and Convalescent Center, Inc., a Florida nonprofit corporation
to KeyCorp Real Estate Capital Markets, Inc., an Ohio corporation
dated as of November 28, 2006**

**THIS SECOND MODIFICATION OF MORTGAGE NOTE** (this "Second Modification of Note") is made as of June 1, 2020, by and between **MIRACLE HILL NURSING AND REHABILITATION CENTER, INC.,** a Florida nonprofit corporation formerly known as Miracle Hill Nursing and Convalescent Center, Inc., a Florida nonprofit corporation (hereinafter called "Maker") and **KEYBANK NATIONAL ASSOCIATION,** a national banking association, successor by merger to KeyCorp Real Estate Capital Markets, Inc., an Ohio corporation (hereinafter called "Holder") and approved by the **SECRETARY OF HOUSING AND URBAN DEVELOPMENT** ("HUD"). This Second Modification of Note is attached to and incorporated in that certain mortgage note dated as of November 28, 2006, executed and delivered by Maker to Holder in connection with the project known as Miracle Hill Nursing and Convalescent Center, FHA Project No.        2023, in the original principal sum of Five Million Eight Hundred Seven Thousand Seven Hundred and No/100 Dollars ($5,807,700.00), as amended by the Modification of Mortgage Note dated as of August 1, 2015 by and among Maker, Holder, and HUD (collectively, the "Note").

FOR AND IN CONSIDERATION OF the sum of Ten Dollars ($10.00) in hand paid and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, the parties, for themselves and for their respective successors and assigns, do hereby agree that, effective on the "Effective Date" (as hereinafter defined), the terms of the Note to which this Second Modification of Note is appended are hereby amended as follows:

1.        The obligation of Maker under the Note to make monthly payments of principal and/or interest is hereby amended (a) by replacing the phrase "with interest thereon from the date hereof at the rate specified herein on the unpaid balance until paid" located in the first sentence of the first paragraph of the Note with the phrase "with interest at the rate specified herein on the unpaid balance until paid"; and (b) by inserting in lieu of the text immediately following such first sentence (which begins "The principal and interest . . ." and concludes ". . . shall be applied on account of principal") the following:

"The principal and interest shall be payable in monthly installments as follows:

Interest alone at the rate aforesaid shall be due and payable on December 1, 2006. Commencing on January 1, 2007, monthly installments of principal and interest shall be due and payable in the sum of Thirty-Four Thousand Ninety-Five and 64/100 Dollars ($34,095.64) each, such payments to continue monthly thereafter on the first day of each succeeding month up to and including September 1, 2015. Commencing on October 1,

Exhibit A

2015, monthly installments of principal and interest shall be due and payable in the sum of Twenty-Six Thousand Six Hundred Seventy-Six and 94/100 Dollars ($26,676.94) each, such payments to continue monthly thereafter on the first day of each succeeding month up to and including July 1, 2020. Commencing on August 1, 2020, monthly installments of principal and interest shall be due and payable in the sum of Twenty-Five Thousand Four Hundred Nine and 92/100 Dollars ($25,409.92), each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full.  In any event, the balance of the principal (if any) remaining unpaid, plus accrued interest, shall be due and payable on December 1, 2041.  The installments of principal and interest shall be applied first to interest at the rate of six and one quarter per centum (6.25%) per annum up to and including August 31, 2015, then at the rate of three and eighty-seven one-hundredths per centum (3.87%) per annum up to and including June 30, 2020, and thereafter at a rate of three and 35/100 per centum (3.35%) per annum, upon the principal sum or so much thereof as shall from time to time remain unpaid, and the balance thereof shall be applied on account of principal."

2.      The Rider to Mortgage Note, dated August 1, 2015, attached to and made a part of the Note, is hereby deleted, and the Rider to Mortgage Note attached hereto, and dated as of even date herewith, is substituted therefor.

3.      The Note is hereby amended so that all references to the "Mortgage" or "mortgage" contained in the Note shall be deemed to be references to the Mortgage securing the Note, as modified to date (if applicable) and as modified by that certain Modification Agreement dated as of August 1, 2015, by and between Maker and Holder (the "Modification Agreement"), and that certain Second Modification Agreement of even date herewith by and among the Maker, the Holder, and HUD (the "Second Modification Agreement").

4.      Maker hereby acknowledges and affirms to the Holder that, as of the Effective Date, there are no counter-claims, defenses, or set-offs, whether legal or equitable, to Maker's obligations under the Note, as amended, and Maker hereby waives the right to raise or assert any such defenses, set-offs, or counter-claims, as well as any and all other claims, which Maker has, had, or may have had against Holder with respect to any matter or claim based upon any act, event, occurrence or omission occurring or arising prior to the Effective Date.

5.      Maker hereby acknowledges and affirms to the Holder that, as of the Effective Date, Maker is in compliance with all of Maker's obligations under the Note.

6.      From and after the Effective Date, the Note, all amendments to date, and this Second Modification of Note shall be taken and read together as one, single and continuing instrument evidencing a single debt owed by the Maker to the Holder in the amount set forth in the Note, as may be unpaid from time to time. Nothing contained herein shall be taken or construed to create a novation or new agreement by and between the Maker and the Holder, it being the intention of the parties solely (a) to reduce the per annum rate of interest applicable under the Note, (b) to revise the amount of monthly installments of principal and interest payable thereunder as a result of such reduction in interest rate so as to reamortize in full the outstanding principal balance of the loan evidenced by the Note over the remaining term thereof, and (c) to revise certain other provisions of the Note, as reflected by this Second Modification of Note, and for no other purpose. Furthermore, (x) nothing

2

herein contained shall in any way impair the Note or the security now held for such indebtedness, or alter, waive, annul, vary, or affect any provision, condition, or covenant therein except as herein provided, nor affect or impair any rights, powers, or remedies of the Holder under the Note, it being the intent of the parties that the terms and provisions of the Note shall continue in full force and effect except as modified hereby, and (y) nothing herein contained shall waive, compromise, impair or prejudice any right that Holder or HUD may have to seek judicial recourse for any breach by Maker of the Regulatory Agreement for Multifamily Housing Projects dated November 28, 2006 between Maker and HUD (the "Regulatory Agreement") that may have occurred prior to or may occur subsequent to the date of this Agreement; in the event that Holder or HUD initiates an action for breach of the Regulatory Agreement and recovers funds, either on behalf of Holder or HUD, or on behalf of the Project or Maker, those funds may be applied, at the discretion of HUD, to payment of the delinquent amounts due under the Note and Mortgage, as amended hereby, or as a partial prepayment of the Loan.

7.    Notwithstanding anything herein contained, if any one or more of the provisions of this Second Modification of Note shall for any reason whatsoever be held to be illegal, invalid, or unenforceable in any respect, such illegality, invalidity, or unenforceability shall not affect any other provision of this Second Modification of Note, but this Second Modification of Note shall be construed as if such illegal, invalid, or unenforceable provision had never been contained herein.

8.    Maker and Holder agree to execute such other documents as may be necessary to implement the terms and provisions of this Second Modification of Note, and the transaction evidenced hereby, including but not limited to the Second Modification Agreement.

9.    The Note, as amended by this Second Modification of Note, may not be further amended except by an instrument in writing executed by each of the parties hereto.

10.    This Second Modification of Note shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

11.    Maker and Holder acknowledge and agree that the terms of this Second Modification of Note and the Second Modification Agreement are subject to and contingent upon the approval thereof by HUD, which approval shall be evidenced by the written consent on behalf of HUD affixed to this Second Modification of Note and to the Second Modification Agreement, and further acknowledge and agree that the terms of this Second Modification of Note and the Second Modification Agreement shall not be deemed effective unless and until (i) HUD executes the consents as aforesaid and (ii) the Second Modification Agreement is recorded in accordance with the terms thereof (the date on which the Second Modification Agreement is so recorded is sometimes referred to herein as the "Effective Date").

12.    This Second Modification of Note may be executed in any number of counterparts and all counterparts shall be construed together and shall constitute but one agreement.

**IN WITNESS WHEREOF,** Maker, Holder, and HUD have executed this Second Modification of Note as of the date first set forth above.

*[Remainder of page intentionally left blank. Counterpart signature pages follow.]*

3

Exhibit A

10. This Second Modification of Note shall be binding upon and shall inure to the benefit 34 of 39
of the parties hereto and their respective successors and assigns.

11. Maker and Holder acknowledge and agree that the terms of this Second Modification of Note and the Second Modification Agreement are subject to and contingent upon the approval thereof by HUD, which approval shall be evidenced by the written consent on behalf of HUD affixed to this Second Modification of Note and to the Second Modification Agreement, and further acknowledge and agree that the terms of this Second Modification of Note and the Second Modification Agreement shall not be deemed effective unless and until (i) HUD executes the consents as aforesaid and (ii) the Second Modification Agreement is recorded in accordance with the terms thereof (the date on which the Second Modification Agreement is so recorded is sometimes referred to herein as the "Effective Date").

12. This Second Modification of Note may be executed in any number of counterparts and all counterparts shall be construed together and shall constitute but one agreement.

IN WITNESS WHEREOF, Maker, Holder, and HUD have executed this Second Modification of Note as of the date first set forth above.

[Remainder of page intentionally left blank. Counterpart signature pages follow.]

## COUNTERPART SIGNATURE PAGE TO
## SECOND MODIFICATION OF MORTGAGE NOTE

**MAKER:**

**MIRACLE HILL NURSING AND REHABILITATION CENTER, INC.,** a Florida nonprofit corporation, formerly known as Miracle Hill Nursing and Convalescent Center, Inc., a Florida nonprofit corporation

By: _____

Name: ROLAND H. GAINES

Title: Chairman, Board of Directors

## COUNTERPART SIGNATURE PAGE TO
## SECOND MODIFICATION OF MORTGAGE NOTE

**HOLDER:**

**KEYBANK NATIONAL ASSOCIATION,** a national banking association, successor by merger of KeyCorp Real Estate Capital Markets, Inc., an Ohio corporation

By: _____

Name: _____

Title: _____

## COUNTERPART SIGNATURE PAGE TO
## SECOND MODIFICATION OF MORTGAGE NOTE

MIRACLE HILL NURSING AND CONVALESCENT CENTER

Exhibit A

## COUNTERPART SIGNATURE PAGE TO
## SECOND MODIFICATION OF MORTGAGE NOTE

**HOLDER:**

**KEYBANK NATIONAL ASSOCIATION,** a national banking association, successor by merger of KeyCorp Real Estate Capital Markets, Inc., an Ohio corporation

By: _____
Name: _Annetta Berry_
Title: _Vice President_

5

Exhibit A

## COUNTERPART SIGNATURE PAGE TO
## SECOND MODIFICATION OF MORTGAGE NOTE

MIRACLE HILL NURSING AND CONVALESCENT CENTER
FHA Project No.          2023

**CONSENT TO SECOND MODIFICATION OF MORTGAGE NOTE:**

The undersigned hereby consents to and approves
the foregoing Second Modification of Mortgage Note as of the date first set forth above.

**SECRETARY OF HOUSING AND URBAN
DEVELOPMENT,** acting by and through the Federal
Housing Commissioner

By:      _Jennifer S. Brinkman_
Name:  _Jennifer S. Brinkman_
Title:   Authorized Agent

6

Exhibit A

## RIDER TO MORTGAGE NOTE

This Rider to Mortgage Note (this "Rider"), made as of June 1, 2020, is attached to and made a part of the Mortgage Note dated as of November 28, 2006, from Miracle Hill Nursing and Rehabilitation Center, Inc., a Florida nonprofit corporation now known as **MIRACLE HILL NURSING AND REHABILITATION CENTER, INC.,** a Florida nonprofit corporation (hereinafter called "Maker"), to **KEYBANK NATIONAL ASSOCIATION,** a national banking association, successor by merger to KeyCorp Real Estate Capital Markets, Inc., an Ohio corporation, as amended by the Modification of Mortgage Note dated as of August 1, 2015 by and among Maker, Holder, and **SECRETARY OF HOUSING AND URBAN DEVELOPMENT** ("HUD") (collectively, the "Note").

     1.    Prepayment. (a) Except as hereinafter set forth, Maker shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time. Maker shall have the right, on or after September 1, 2020 (the "Lockout Termination Date") to prepay the indebtedness evidenced hereby in whole or in part on the last business day of any calendar month on or after such date during the term hereof upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid. Such total amount shall include interest accrued through and including the last day of the month in which the prepayment is made. In the event of any prepayment of principal at any time on or after the Lockout Termination Date, the Maker shall concurrently pay to the holder of this Note (i) interest on the amount prepaid through and including the last day of the month in which the prepayment is made and (ii) a prepayment premium equal to the following designated percentages of the amount of the principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| from September 1, 2020 through August 31, 2021 | 10.0% |
| from September 1, 2021 through August 31, 2022 | 10.0% |
| from September 1, 2022 through August 31, 2023 | 10.0% |
| from September 1, 2023 through August 31, 2024 | 7.0% |
| from September 1, 2024 through August 31, 2025 | 6.0% |
| from September 1, 2025 through August 31, 2026 | 5.0% |
| from September 1, 2026 through August 31, 2027 | 4.0% |
| from September 1, 2027 through August 31, 2028 | 3.0% |
| from September 1, 2028 through August 31, 2029 | 2.0% |
| from September 1, 2029 through August 31, 2030 | 1.0% |
| from September 1, 2030 and thereafter | 0.0% |

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, without the prior written consent of the holder of this Note (which consent such holder shall have no obligation to give), the Maker shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

     (b)    Notwithstanding any prepayment prohibition imposed and/or premium required by this Note with respect to prepayments made prior to September 1, 2029, the indebtedness evidenced by this Note may be prepaid in whole or in part on the last business day of any calendar month without the consent of the holder of this Note and without prepayment premium if the Federal Housing Commissioner (the "Commissioner") determines that prepayment will avoid a mortgage insurance claim and is therefore in the best interests of the Federal Government. The holder of this Note understands that the Commissioner would consider exercising its right to override the prepayment prohibition and/or prepayment premium contained herein only upon satisfaction of all of the following terms and conditions:

(i)    Maker has defaulted under this Note and the Commissioner has received notice of such default, as required by 24 C.F.R. §207.256;

(ii)    The Commissioner determines that the project financed with the proceeds of this Note has been experiencing a net income deficiency, which has not been caused solely by management inadequacy or lack of interest by Maker, and which is of such magnitude that Maker is currently unable to make required debt service payments, pay all project operating expenses and fund all required HUD reserves;

(iii)    The Commissioner finds there is reasonable likelihood that Maker can arrange to refinance the loan evidenced by this Note at a lower interest rate or otherwise reduce the debt service payments through partial prepayment; and

(iv)    The Commissioner determines that refinancing the loan evidenced by this Note at a lower rate or partial prepayment is necessary to restore the said project to a financially viable condition and to avoid an insurance claim.

(c)    Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to any prepayment which is made by or on behalf of the Maker from insurance proceeds as a result of damage to the mortgaged premises or condemnation awards which, at the option of the holder of this Note, may be applied to reduce the indebtedness of Maker evidenced hereby pursuant to the terms and provisions of the security instrument securing this Note (the "Mortgage") of even date with the Note, given by Maker to the original holder of this Note to secure said indebtedness. Any prepayment made pursuant to this Paragraph 1(c) shall be deemed to have been made on the last day of the month in which such payment is received by holder and shall include interest on the amount prepaid through and including the last day of the month in which the prepayment is made.

(d)    Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, in the event that the maximum principal amount of this Note is reduced (or a partial prepayment is made) solely as the result of a mortgage reduction (or a partial prepayment) required by the Commissioner based upon any cost certification or other report required to be provided by the Maker to the Commissioner subsequent to the date hereof. Any prepayment made pursuant to this Paragraph 1(d) shall be deemed to have been made on the last day of the month in which such payment is received by holder and shall include interest on the amount prepaid through and including the last day of the month in which the prepayment is made.

2.    Late Charges.  In the event any installment or part of any installment due under this Note becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder of this Note, in addition to other sums due hereunder, a late charge in an amount equal to two percent (2%) of the amount of principal and/or interest so delinquent. Whenever, under the law of the jurisdiction where the property is located, the amount of any such late charge is considered to be additional interest, this provision shall not be effective if the rate of interest specified in this Note, together with the amount of the late charge, would aggregate an amount in excess of the maximum rate of interest permitted and would constitute usury.

3.    Method of Payment.  All payments to reduce the principal balance hereunder, other than regularly scheduled payments of principal, and all late charges and other amounts required to be paid hereunder, other than regularly scheduled installments of interest, shall be made to the holder of this Note in immediately available Federal Funds. Payments received after 12:00 noon Eastern time will be deemed to have been received on the next following business day.

R-2

Exhibit A

4.    Non-Recourse.  Notwithstanding any other provision contained in this Note, it is agreed that the execution of this Note shall impose no personal liability on the Maker hereof for payment of the indebtedness evidenced hereby, and, in the event of a default, the holder hereof shall look solely to the "Collateral" (defined below) in satisfaction of the indebtedness evidenced hereby and will not seek or obtain any deficiency or personal judgment against the Maker hereof except such judgment or decree as may be necessary to foreclose or bar its interest in the Collateral, except as set out in the Mortgage.  As used herein, "Collateral" shall mean and include (i) the property subject to the Mortgage, including, but not limited to, the land, improvements, equipment, personal property, and appurtenances thereto, and the rents, issues, and profits thereof, as set forth in said Mortgage and (ii) the collateral described in the Security Agreement of even date with the Note given to further secure the Note.

IN WITNESS WHEREOF, the undersigned Maker has executed this Rider as of the date first above written.

MAKER:

MIRACLE HILL NURSING AND
REHABILITATION CENTER, INC., a Florida
nonprofit corporation, formerly known as Miracle
Hill Nursing and Convalescent Center, Inc., a
Florida nonprofit corporation

By:
Name: ROLAND H. GAINES
Title: Chairman, Board of Directors

R-1

Exhibit A